UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

**HOFIT JENKINS,**

        **Petitioner,**

**-v-**

**AVRAHAM JENKINS, et al.,**

        **Respondents.**

**Case No. 3:08-CV-037**

**Judge Thomas M. Rose**

---

**ENTRY AND ORDER DISSOLVING THE PRELIMINARY INJUNCTION (Doc. #16); DENYING PETITIONER'S AMENDED REQUEST FOR RETURN OF CHILD (Doc. #7); FINDING RESPONDENT'S MOTION FOR SUMMARY JUDGMENT MOOT (Doc. #19) AND TERMINATING THIS CASE**

---

Hofit Jenkins ("Hofit"), the mother and Petitioner, seeks return of her child, Orin Jenkins ("Orin").[1] Avraham Jenkins ("Avraham"), the father and Respondent, currently has Orin at 511 Ruby Throat Lane in Clayton, Ohio. Klaris Jenkins ("Klaris"), Avraham's mother, is also named a Respondent.

**PROCEDURAL BACKGROUND**

This case began with the filing by the Petitioner of a Petition for Return of Child (doc. #4) and an ex parte Motion for Temporary Restraining Order ("TRO") on February 11, 2008. (Doc. #2.) The TRO was issued on Feburary 12, 2008. (Doc. #6.) It prohibited the Respondent from removing Orin from the jurisdiction of this Court and set a Preliminary Injunction ("PI") hearing for February 21, 2008.

On February 19, 2008, Petitioner filed an Amended Verified Petition for Return of Child

---

[1] Orin was born on April 25, 2004, and is now approximately 4 years old.

that named both Avraham and Klaris as Respondents. (Doc. #7.) She also filed an Amended Motion for a TRO at that time. (Doc. #8.) The Court then issued a TRO substantially the same as the initial TRO but naming Klaris, in addition to Avraham, as a Respondent. (Doc. #9.)

The Respondents were served on February 22, 2008, and an evidentiary hearing on the TRO was conducted on March 5, 2008. The Parties then submitted an Agreed PI. The Court approved the Agreed PI as submitted. (Doc. #16.) The Agreed PI continued the requirement that the Respondents be prohibited from removing Orin from the jurisdiction of this Court. (Id.) The Agreed PI also provided for limited discovery and a hearing (the "Hearing") on the Petition beginning April 16, 2008. (Id.)

Prior to the scheduled Hearing, the Respondents submitted a Motion for Summary Judgment (doc. #19.) and the Petitioner submitted a Pretrial Memorandum (doc. #21). The Parties also submitted a Proposed Pretrial Order. (Doc. # 20.) The Hearing was conducted on April 16, 17 and 18, 2008. The Court conducted an in camera interview of Orin during the Hearing. Following the Hearing, both the Petitioner and the Respondents submitted Trial Briefs and Replies. (Doc. #33, 34, 35, 36.) The Petition is, therefore, ripe for decision.

This is an action brought by the Petitioner pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") seeking an order that Orin be sent to Israel to determine custody. The Petitioner claims that the Respondents have wrongfully retained Orin, thus depriving her of her custody rights as they exist in Israel and that Israel was Orin's place of "habitual residence" when he was wrongfully retained. The Respondents contest Petitioner's assertions and argue that the decision to come to the United States was a voluntary decision made by Hofit, Avraham and Orin as a family and their

-2-

collective intention was to try to settle in the United States permanently.

In October of 2007, Avraham filed a custody action in the Montgomery County Juvenile Court. The custody action has been stayed pending the outcome of this Petition for Return of Child.

On October 30, 2007, Petitioner filed a Statement of Claim for Child and Spousal Support against Avraham in the Family Matters Court in Haifa, Israel. (Am. Verified Petition ¶17.) On April 7, 2008. the Israeli Court found that it had jurisdiction to review Hofit's alimony claim but does not currently have jurisdiction to review the claim for child support for Orin and an unborn child. In addition, on October 31, 2007, Petitioner filed for divorce from Avraham in the District Rabbinical Court in Haifa, Israel. (Id.)

## FACTUAL BACKGROUND

The Parties, as might be expected in this situation, have attacked each other's credibility and the credibility of some of the witnesses. The Court has reached its own conclusions regarding the facts.

 This decision embodies the Court's findings of fact and conclusions of law. The factual findings are based upon the testimony and exhibits admitted into evidence and the credibility and demeanor of the witnesses. The Court's findings of fact are included in this factual background and in the analysis of the Petition.

Respondent Klaris Jenkins, an Israeli citizen, met and married an American citizen named Dennis Jenkins ("Dennis"). Klaris had two sons by a previous marriage, Avraham and Eric. Avraham was born in Israel on October 25, 1977.

Klaris and Dennis moved to the U.S. with their two sons. Avraham lived in the U.S. for a

number of years with his mother and stepfather. Avraham joined the United States Air Force, but, while on vacation to Israel, he was detained to serve as a member of the Israeli Defense Force ("IDF").

Hofit was born in Haifa, Israel on November 9, 1979. With the exception of a few months in Ohio, she has lived her entire life in Israel where she graduated from secondary school, served in the IDF and was employed as a secretary.

Avraham and Hofit met while serving in the IDF and were married on November 28, 2002. Orin was born in Haifa, Israel on April 25, 2004. Hofit stayed home for the first eight months after Orin was born, but then returned to work.

Orin was part of Hofit's extended family, including Orin's grandparents and cousins, in Tirat Karmel, Israel. Hofit's father and Orin's grandfather, Chaim Abhasra, picked up Hofit and Orin every morning and delivered Hofit to work and Orin to school. Mr. Abhasra then picked up Hofit and Orin each evening and drove them to his house where Hofit and Orin usually had dinner.

In 2005, Hofit, Avraham and Orin came to the United States to visit Klaris and Dennis. They came to the U.S. on a travel visa and subsequently applied for green cards with hopes that they could obtain green cards during the six-month visa period. However, they were told the green cards would take several years so they stayed a little longer on vacation and returned to Israel.

At the end of 2006, Avraham was offered a job opportunity to come to the U.S. for a contract period of three years, which was renewable. Hofit and Avraham decided to accept this opportunity. Hofit indicates that the amount of time she was planning to stay was open.

However, there is evidence that she was excited about the opportunity to move to the U.S.

Hofit quit her job a few months early to begin the preparation of moving. What possessions could not be sold were thrown away. Hofit, Avraham and Orin came to the U.S. with the possessions that they could pack in suitcases. They left a joint bank account in Israel with Hofit's father acting as their power of attorney. They moved to the U.S. on April 1, 2007.

Avraham, Hofit and Orin initially lived with Klaris for about two months. They then began looking for a house of their own because living with Klaris was not working out. They met with realtor John Baker to discuss moving into a new house. In May of 2007, they signed a one-year lease on a house in Clayton, Ohio. The house they were leasing was unfurnished so they bought new furniture. Hofit specifically inquired about the possibility of purchasing the house.

Avraham and Hofit returned to Israel sometime in July of 2007 to obtain work visas which would allow them to stay and work in the U.S. for three years. Orin stayed with Klaris for the two and one half weeks that Hofit and Avraham were in Israel.

When they returned to the U.S., Hofit and Avraham's relationship was at a low. There are disputes over how long Hofit was in the U.S. before she became unhappy and why she became unhappy. Hofit wanted to return to Israel.

Avraham hid Orin's passport and refused to allow Hofit to take Orin back to Israel. Hofit asked for an airline ticket to Israel and, on September 22, 2007, boarded an airplane for New York City to wait for her return ticket to Israel to be activated.

Avraham did not permit Hofit to take Orin with her. Hofit boarded the plane for Israel and has not returned. Avraham and Hofit have maintained contact since her departure both over

the telephone and over MSN messenger.

Orin was in daycare in Israel for approximately seven and one-half hours per day every day except holidays from when he was eight months old until approximately three weeks before coming to the U.S. In the U.S., Orin started school on April 17, 2007, at the Hillel Academy, where Klaris worked as a Hebrew teacher. This was a joint decision by Avraham and Hofit because they wanted Orin to learn English and to make friends. Orin now attends a different school. Orin is very close to his older cousins in Israel and, prior to September 22, 2007, wanted to talk to them and have them come to see him.

Avraham leaves Orin with Klaris when he travels on business. Avraham was away from his home for about six weeks between April 1, 2007 and September 22, 2007. Since then, Avraham was at home for November and December of 2007 and otherwise is away on business for about two weeks every month. When Avraham is away on work, Klaris cares for Orin.

## THE HAGUE CONVENTION

Petitioner seeks return of the child pursuant to the Hague Convention. Both the U.S. and Israel are Contracting States to the Hague Convention. *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995). The U.S. statute that implements the Hague Convention is 42 U.S.C. § 11601 et seq. titled the International Child Abduction Remedies Act ("ICARA"). *Id.*

The purpose of the Hague Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to ensure their prompt return to the State of their habitual residence." *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007). The Hague Convention prevents circumstances where a child is taken out of the family and social environment in which its life has developed. *Id.*

An individual claiming that a child has been wrongfully removed to or retained in the U.S. can commence judicial proceedings under the Hague Convention by filing a petition for the return of a child in a state or federal court which has jurisdiction where the child is located. 42 U.S.C. § 11603(b). For the petition to be granted, the petitioner must prove by a preponderance of the evidence that the removal or retention was wrongful. If the petitioner proves that the removal or retention was unlawful, the court must order the child to be returned to the "habitual residence" unless the Respondent proves one of the available affirmative defenses.

The Hague Convention is effectively a form of forum selection. It was not intended to resolve international custody disputes. *Robert*, 507 F.3d at 988. Under the Hague Convention, the removal of a child from one nation to another is wrongful when:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Id.*(quoting the Hague Convention, Article 3).

The Third Circuit has identified four questions that must be answered in Hague Convention cases. *Karkkainen v. Kovalchuk,* 445 F.3d 280, 287 (3d Cir. 2006). A court must determine: (1) when the removal or retention took place; (2) the child's "habitual residence" immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's "habitual residence;" and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention. *Id.* The Sixth Circuit has not specifically set forth this list of factors but has discussed each of them individually depending upon the alleged errors being reviewed. *See e.g. Robert*, 507 F.3d

981)(discussing habitual residence), *Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007)(discussing habitual residence), *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996)(discussing custody rights and exercise thereof, habitual residence). Therefore, each of these factors will be addressed with regard to the Petition that is now before the Court.

## ANALYSIS OF FACTORS

### (1) Date of Retention

The date then the alleged wrongful detention occurred is used to establish the relevant date of the child's "habitual residence." *Karkkainen*, 445 F.3d at 290. The Third Circuit has found the date of retention to be the date prior to which it is undisputed that the child was present in the new country with both parent's permission. *Id.* at 291. The Sixth Circuit has not specifically opined on this issue.

In this case, the Petitioner argues that the alleged wrongful retention occurred on September 22, 2007. This is the date when Avraham drove Hofit to the airport, bought her a ticket to New York, put her on the plane and refused to allow Orin to go with her.

The Respondents argue that the alleged wrongful retention occurred when Petitioner took her first action to assert her custody rights, which was the filing of her Petition in Israel on November 7, 2007. This petition was filed immediately after she filed in the Israeli courts for alimony, divorce and child support.

Based upon the testimony and facts of this case, the alleged wrongful retention occurred on September 22, 2007. This is the date prior to which it is undisputed that Orin was present in the U.S. with both parent's permission.

-8-

### **(2) "Habitual Residence"**

**Legal Provisions**

There is no Supreme Court authority on the meaning of the term "habitual residence." The Sixth Circuit, most recently in *Robert v. Tesson*, has, however, established some principles to be followed in making a determination. 507 F.3d at 989.

First, "habitual residence" should not be determined through the "technical" rules governing legal residence or common law domicile and court should, instead, look closely at the facts and circumstances of each case. *Id.* Second, the court should consider the child's experience in determining "habitual residence." *Id.* Third, the "habitual residence" inquiry should focus exclusively on the child's past experience and any future plans that the parents may have are irrelevant. *Id.* Fourth, a person can have only one "habitual residence." *Id.* Finally, a child's "habitual residence" is not determined by the nationality of the child's primary care-giver and only a change in geography and the passage of time may combine to establish a new "habitual residence." *Id.*

In *Robert*, the Sixth Circuit emphasizes that the "habitual residence" inquiry should focus solely on the past experiences of the child and not the intentions of the parents. *Id.* at 991. The Hague Convention's general principle that "children must no longer be regarded as parents' property, but must be recognized as individuals with their own rights and needs" is best given effect by a finding which honors the child's perception of where home is, rather than a finding which subordinates the child's experience to their parents' subjective desires. *Id.* at 992.

The Sixth Circuit holds that, "a child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this

-9-

presence has a 'degree of settled purpose from the child's perspective.' *Id.* at 993. The Sixth Circuit does however, specifically "express no opinion on whether the "habitual residence" of a child who lacks cognizance of his or her surroundings should be determined by considering the subjective intentions of his or her parents." *Id.* Finally, "habitual residence" must be shown by a preponderance of the evidence. *Id.* at 995.

The Sixth Circuit refers to the Third Circuit's decision in *Karkkainen* for "helpful" guidance for determining whether a child has been acclimatized to a new country and whether the child's stay in that country has a settled purpose. *Robert*, 507 F.3d at 996. First, the Sixth Circuit noted with approval the Third Circuit's consideration of parental conduct. Rather than focusing on the mother's subjective intentions regarding the child's nation of residence, the Third Circuit focused on how the child's parents "colored her attitude" towards her stay in the new country. *Id.* The intentions of the child's parents may affect the length of time necessary for a child to become habitually resident or otherwise influence a child's ability to acclimatize. *Karkkainen*, 445 F.3d at 292.

The Sixth Circuit then notes with approval the factual circumstances considered by the Third Circuit in *Karkkainen*.[2] *Robert*, 507 F.3d at 996. The Third Circuit listed several factual circumstances to be considered in determining whether or not a child's stay in a new country meets the tests of "acclimatization" and "settled purpose." *Id.* Academic activities are among "the most central… in a child's life" and therefore highly suggestive of acclimatization. *Id.*(citing *Karkkainen*, 445 F.3d at 293). "Social engagements," "participation in sports programs

---

[2] The child in *Karkkainen* was 14 years old and had been in the U.S. for approximately 3 years when the Third Circuit determined her "habitual residence."

-10-

and excursions," and meaningful connections with the people and places" in the child's new country are indications of acclimatization. *Id.* (quoting *Karkkainen*, 445 F.3d at 294. The fact that the child brought personal belongings to the new country is evidence of a settled purpose. *Id.* Finally, the child's own stated desire to reside in the new country is to be considered. *Id.*

### "Habitual Residence" Analysis

In this case, the Court must determine whether, as of September 22, 2007, Orin had been present in the U.S. long enough to allow acclimatization, and where Orin's presence has a degree of settled purpose from Orin's perspective. On September 22, 2007, Orin was an Israeli citizen who had lived in the U.S. for almost six months. Orin had also visited the U.S. for a short period of time with his parents in 2005. The analysis involves a discussion of each of the factual circumstances identified by the Sixth Circuit to be considered in determining whether Orin's stay in the U.S. meets the test of "acclimatization" and "settled purpose."

The first factual circumstance is Orin's involvement in academic activities. He attended preschool in Israel before coming to the U.S. on April 1, 2007 as he neared his third birthday. Within about two weeks after arrival in the U.S., Orin was enrolled in the Hillel Academy and later in another school. Orin was in school in the U.S. essentially full time from his arrival until and after the alleged date of retention.

There is testimony that Orin is very comfortable in speaking in both Hebrew and English. During his in camera interview with the Court, Orin spoke and understood English as well as any other four-year old English-speaking child could. Although he did not speak Hebrew when asked, he did use at least one Hebrew word during the conversation.

The second factual circumstance to be considered is social engagements. Orin made a

-11-

number of friends when he attended the Hillel Academy. He socializes with these children at Synagogue. He also attends parties and other social activities with them. Orin indicated during the in camera interview that he goes to Synagogue with all of his friends.

The third factual circumstance to be considered is participation in sports programs and excursions. No specific mention is made of sports programs by any of the adult witnesses but Orin indicated, during the in camera interview, that he plays sports with a friend named "Tammy." He also indicated that he plays every day at school. As for excursions, there is evidence that Orin has visited parks in the area and enjoys regular trips to the U.S. Air Force Museum.

The fourth factual circumstance is meaningful connections that Orin may have with people and places in the U.S. Orin lives in a house in the U.S. with his father. He acknowledged this fact in the in camera interview. Orin also spends a considerable amount of time with Klaris, one of his grandmothers, who takes him to Synagogue and takes him on excursions while his father is away on business trips. Finally, Orin has friends at school and at the Synagogue.

The fifth factual circumstance to be considered is whether Orin brought his personal belongings to the U.S. Orin brought all of his personal belongings to the U.S. that were not otherwise disposed of by his parents before leaving Israel. Also, as of the date of the alleged wrongful retention, Orin had all of his personal belongings, including his toys, with him in the U.S. He has his own room in the house where he lives and keeps his personal belongings there.

The final factual circumstance to be considered is Orin's stated desire to reside in the U.S. Orin did not respond to this specific question when asked during the in camera interview.

**Petitioner's Arguments**

Petitioner argues that Orin is acclimated to Israel and not the U.S. because, when in Israel, Orin was part of his mother's large extended family in Tirat Karmel, had many friends in Tirat Karmel, spent most of his time with his mother and was very close to his teacher. While this may be true, the Court must look to whether Orin has become acclimated to the U.S.

Petitioner also argues that no children Orin's age live in Klaris's neighborhood or in the neighborhood where Orin now lives. While this may be true, Orin regularly attends school, plays and attends Synagogue with children his age.

Petitioner also argues that Orin has a unique heritage as an Israeli Jew that can only be properly developed in Israel. While, again, this may be true, the Court is only to determine Orin's "habitual residence" at the time of the wrongful removal and considerations of where Orin's heritage can properly be developed are not a part of this determination.

Petitioner also testified that Orin did not adjust well to the U.S. and that he regards Israel as his home. However, there is evidence that Orin has adjusted to the U.S. and there is no direct evidence that Orin regards Israel as his home.

Petitioner also argues that sufficient time has not passed for Orin to become acclimated to the U.S. This is a general argument that is addressed above by an analysis of the factual circumstances and not by broad conclusions.

Petitioner's final argument is that Orin's in camera interview shows a deeply disturbed and disoriented child. However, this is not the case. During the in camera interview, Orin appeared to be a normal four-year old boy. He was well-mannered, he conversed with the interviewers and he appeared to be happy. He had and was playing with a toy airplane. As might

be expected, he was occasionally distracted by things he could see going on outside the window.

During the in camera interview, Orin was able to say how old he was in English and mentioned a birthday party several times. He later said that it was his birthday party. He also looked out the window and was able to identify a train and a bus that were going by. When asked to say something in Hebrew, Orin only said the word "apatchi."[3] Further, he talked about going to the "apatchi" today.

The in camera interview was conducted one week before Orin's fourth birthday. Orin indicated that he did live in a house with his mother and father but now lives in a house with his father. He also indicated that he has toys at his home. Finally, Orin said that he last saw his mother "in the airplane" and that he cried because he lost her then. Finally, he said that his mother now lives in a "castle."

### Orin's "Habitual Residence"

On September 22, 2007, when the alleged wrongful retention occurred, Orin had been present in the U.S. long enough to become acclimatized. Based upon an analysis of the appropriate factual circumstances, Orin's presence in the U.S. has a degree of settled purpose. Orin's "habitual residence" on September 22, 2007, at the time of the alleged wrongful retention, was in the U.S.

Orin has been attending school in the U.S. since shortly after his arrival and continues to do so. He appears to speak and understand the English language as well as can be expected of a four-year-old.

Orin also has meaningful connections with the people and places in the U.S. He has

---

[3]"Apatchi" is the Hebrew word for airplane.

friends his age at school and at the Synagogue that he regularly attends. He lives in a house in the U.S. with his father where he has his own room and where he keeps all of his possessions. He is taken on excursions to local parks and regularly makes trips to the U.S. Air Force Museum. Klaris, his grandmother, spends a significant amount of time with him, particularly when his father is away on business. Finally, during the in camera interview, Orin appeared to be a normal four-year old boy who is not deeply disturbed.

## Alternative Considerations

In this case, the Petitioner challenges whether Orin had cognizance of his surroundings on the date of the alleged wrongful retention due to Orin's tender age, at the time, of 3½ years. The Third Circuit has found that a four-year old "is not only cognizant of his or her surrounding, but also of an age at which it is able to develop a certain routine and acquire a sense of environmental normalcy." *Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004), *cert. denied*, 545 U.S. 1131 (2005). A four-year old child "is not only aware of those around him, but is able to form meaningful connections with people and places he encounters each day." *Id.* However, the Third Circuit found that a one-year old does not have this ability. *Id.* As determined above, Orin is in the same category as the four-year old discusses in *Whiting*. However, if he were not, his "habitual residence" would still be in the U.S.

In *Robert*, the Sixth Circuit specifically declined to express an opinion on whether the "habitual residence" of a child who lacks cognizance of his or her surroundings should be determined by considering the subject intent of his or her parents. *Robert*, 507 F.3d at 993. In *Robert*, the Sixth Circuit did, however, refer with approval to the Third Circuit's reasoning in *Feder* and *Whiting*.

In both *Feder* and *Whiting*, the Third Circuit was determining the "habitual residence" of young children, a one-year old in *Whiting* and a four-year old in *Feder* at the time of the wrongful retention. In both of these cases, the Third Circuit first focused on the child and considered the "habitual residence" to be the place where the child had been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose. *Feder*, 63 F.3d at 224; *Whiting*, 391 F.3d at 550-51. The Third Circuit found, however, that the children involved in both cases were of a tender age and not cognizant of their surroundings. It then considered the parents' present, shared intentions regarding the child's location. *Feder*, 63 F.3d at 224; *Whiting*, 391 F.3d at 550.

Therefore, because the Sixth Circuit has looked with favor at these two Hague Convention cases, this Court has reason to believe that, if Orin were found by the Sixth Circuit to be of a tender age and not cognizant of his surroundings, which is not the case, the Sixth Circuit would turn to the parents' shared intentions regarding Orin's location before the alleged wrongful retention.

In this case Avraham and Hofit's shared intention was to move to the U.S. and take Orin with them. They came to the U.S. in 2005 and sought visas to stay. Unsuccessful, they returned to Israel. Then, in 2007, they again came to the U.S. This time, they disposed of all of their belongings before leaving Israel except what they could carry in suitcases. They both sought visas to live and work in the U.S. Avraham had employment in the U.S. for three years which could be extended longer.

A short time after arriving in the U.S., Avraham and Hofit enrolled Orin in school and rented a house in which to live as a family. They decorated and painted the new house and

purchased approximately $18,000 worth of furnishings for it.

Hofit agreed to move, although she now says she agreed to move only for up to three years depending upon whether she was happy in the U.S. There is evidence that Hofit was "excited" about moving to the U.S.

Therefore, if this Court were to look beyond the factual circumstances surrounding Orin's acclimitization in the U.S., it would reach the same conclusion. Orin's "habitual residence" is the U.S. because Avraham and Hofit shared the intention of moving, with Orin, to the U.S. before the alleged wrongful retention.

### (3)Custody Rights

Custody rights include rights relating to the care of the child and, in particular, the right to determine the child's place of residence. *Tsai-Yi Yang v. Fu-Chiang Tsui,* 499 F.3d 259, 274-75 (3dCir. 2007)(citing the Hague Convention Art. 5(a)). To make a custody determination, the laws of the country in which the child "habitually resides" are used to determine whether the party seeking the child's return had custody rights in that country at the time the child was removed or retained. *Id.* at 275.

In this case, Orin's "habitual residence" is in Ohio in the U.S. In Ohio, generally each of the parents of a child who has not attained 18 years of age has joint custody of the child unless a Court has determined otherwise. Therefore, both Hofit and Avraham had custody rights at the time of the alleged wrongful retention.

The Parties argue much about whether there is evidence that Hofit had custody rights under Israeli law, but the result would be the same. Under the Israeli law provided by Petitioner with her Petition, both parents have custody rights to their minor children.

### **(4) Exercising of Custody Rights**

The test for finding the non-exercise of custody rights under the Hague Convention is stringent. *Id.* at 277. Very little is required of the applicant in support of the allegations that custody rights have actually been or would have been exercised. *Id.* For example, the petitioner can show the exercise of custody rights by demonstrating that he or she kept or sought to keep some sort of regular contact with the child. *Id.* (citing *Baxter*, 423 F.3d at 370). Nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custody rights. *Id.*

Courts should liberally find that custody rights are exercised whenever a parent with legal custody rights keeps, or seeks to keep, any sort of regular contact with the child. *Friedrich*, 78 F.3d at 1065. If a person has valid custody rights, whether that person exercised those custody rights well or badly goes to the merits of the custody dispute and are beyond the subject matter jurisdiction of a federal court. *Id.* at 1066.

In this case, Hofit was exercising her custody rights when Orin was allegedly wrongfully retained by Avraham. She lived with Avraham and Orin until she left and she kept regular telephone contact with Orin after leaving.

Avraham was also exercising his custody rights. Orin lived with him both before and after the alleged wrongful retention.

### **AFFIRMATIVE DEFENSES**

In this case, Avraham argues that Orin should not be returned to the town in Israel where Hofit now lives because he would be subject to a grave risk of danger there. However, the Court need not address this affirmative defense because it, for other reasons, does not intend to send

Orin back to the town in Israel where Hofit lives.

## CONCLUSION

The date of the alleged wrongful retention of Orin by Avraham was September 22, 2007. At that time, both Hofit and Avraham had and were exercising their custody rights. Orin's "habitual residence" on September 22, 2007, was in the U.S. Therefore, Hofit's Petition for the return of Orin Jenkins to Israel is DENIED.

There is no longer a need for the Preliminary Injunction. It is, therefore, DISSOLVED.

Respondents' Motion for Summary Judgment need not now be addressed. It is, therefore, MOOT.

Avraham may seek Court approval for the return of Orin's passport when it is appropriate to do so. Finally, The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Thirtieth day of April, 2008.

s/Thomas M. Rose<br>_____<br>THOMAS M. ROSE<br>UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record